UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA    )
    )
      v.    )    1:17-cr-00091-JAW-1
    )
DARIN DOE    )

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

A prisoner serving a ten-year mandatory minimum sentence for possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2255A(b)(2) moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Even though the prisoner's severe obesity, asthma, and high blood pressure increase his risk of serious complications from the COVID-19 virus, the Court concludes that the seriousness of the prisoner's offense, his history of recidivism, the danger he poses to the public, and the need for general and specific deterrence preclude his release. The Court dismisses the motion without prejudice.

## I.    PROCEDURAL BACKGROUND

On July 12, 2017, Darin Doe pleaded guilty to a one-count information, which charged him with possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). *Min. Entry* (ECF No. 8); *Information* (ECF No. 2). On January 18, 2018 the Court sentenced Mr. Doe to one hundred twenty months imprisonment, ten years of supervised release, $5,000.00 in restitution, a $100.00 special assessment, and no fine. *Min. Entry* (ECF No. 22); *J.* (ECF No. 27).

On August 26, 2020 the Court docketed a request from Darin Doe for counsel to assist him in filing a motion for compassionate release. *Mot. for the Appointment of Counsel* at 1-2 (ECF No. 31). On September 3, 2020, the Court ordered Mr. Doe to show cause as to why his Motion for Appointment of Counsel should not be dismissed without prejudice for failure to satisfy the exhaustion requirement of 18 U.S.C. § 3582(c)(1)(A). *Order to Show Cause* at 1-2 (ECF No. 34). On September 22, 2020 the Court received Mr. Doe's renewed motion for the appointment of counsel. *Def.'s Mot. for Appointment of Counsel* (ECF No. 35). Mr. Doe attached a BOP form dated May 22, 2020 and signed by Warden Easter, which denied his request for a sentence modification under 18 U.S.C. § 3582(c)(1)(A). *Id.*, Attach. 2, *Resp. to Inmate Req. to Staff Member* at 2-3.

On September 23, 2020 the Court appointed counsel to represent Mr. Doe. *Appointment of Counsel & Scheduling Order* at 1 (ECF No. 36). The Court ordered Mr. Doe to file a petition for compassionate release within seven days, or otherwise notify the Court that no petition would be filed. *Id.* Four days later, Mr. Doe requested an extension of time, which the Court granted. *Unopposed Mot. to Enlarge Time to File Pet. for Compassionate Release or Notify Court No Pet. Will Be Filed* (ECF No. 37); *Order* (ECF No. 38).

On October 21, 2020, Mr. Doe filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). *Pet. for Compassionate Release* (ECF No. 39) (*Def.'s Mot.*). On October 28, 2020, the Government responded in opposition. *Gov't's Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 40) (*Gov't's Opp'n*). On November 12, 2020

Mr. Doe replied. *Reply Mem. in Supp. of Pet. for Compassionate Release* (ECF No. 43) (*Def.'s Reply*). On December 16, 2020 he filed a supplemental memorandum in support of his reply. *Suppl. Reply Mem in Supp. of Pet. for Compassionate Release* (ECF No. 44) (*Def.'s Suppl. Reply*).

## II. THE PARTIES' POSITIONS

### A. Darin Doe's Motion for Compassionate Release

Mr. Doe first argues that his motion is timely because he submitted evidence showing that he exhausted his administrative remedies within the BOP. *Def.'s Mot.* at 1-2. Next, he discusses the risk presented by the COVID-19 pandemic. *Id.* at 3. He states that "[a]s the pandemic has continued to batter the nation, we have learned that not all Americans are equally at risk to the virus" and "[t]hose suffering from certain preexisting medical conditions are at significantly higher risk . . .." *Id.* Mr. Doe cites guidance from the Centers for Disease Control and Prevention (CDC) for the proposition that "those at high risk for severe illness from COVID-19 include persons with chronic lung disease and pulmonary issues, asthma, serious heart conditions and persons who are obese, among others." *Id.*

 Mr. Doe then considers the risk of COVID-19 within FCI Danbury, where he is incarcerated. *Id.* at 3-4. He highlights that "FCI Danbury was one of only three federal prisons specifically identified by Attorney General William Barr in an April 3, 2020 memo to the Director of the Bureau of Prisons ordering immediate action to place vulnerable inmates on home confinement." *Id.* at 3. He also notes that FCI Danbury's response to the COVID-19 pandemic "has been the subject of

3

*habeas* and class action litigation." *Id.* at 3-4.  Additionally, Mr. Doe observes that the risk of COVID-19 infection is heightened in the close quarters of a federal prison and contends that the BOP, like many government agencies, is "facing the current crisis unprepared." *Id.* at 4.

Shifting to his medical history, Mr. Doe states that he "suffers from numerous, long standing medical difficulties." *Id.* at 5.  He states he is obese, with a body mass index (BMI) of nearly forty-four and, as of June 18, 2020, stood 5'9" tall while weighing two hundred ninety-five pounds.  *Id.*  He notes that current CDC guidance includes obesity as a condition which increases the risk of severe complications from COVID-19.  *Id.*  Mr. Doe also states that he has asthma and cites several cases indicating that respiratory conditions in the prison environment present an extraordinary and compelling reason for release under 18 U.S.C. § 3582(c)(1)(A).  *Id.* at 6-7.  He draws the same conclusion about his other health conditions, which include hypertension and sleep apnea.  *Id.* at 7-8.

Lastly, Mr. Doe presents his release plan.  *Id.* at 9.  He states that he "continues to enjoy the support of his parents" and "is welcome to return to [their] residence in Winslow . . .." *Id.*  He further avers that his "parents have the ability and are willing to provide him with financial and medical support until he is able to retain employment." *Id.*  Mr. Doe believes that, if released, he could return to his prior place of employment, a laboratory in Winslow.  *Id.*

## B.    The Government's Opposition

The Government concedes that "under the present circumstances, [Mr. Doe's] obesity constitutes an extraordinary and compelling reason warranting his release" but ultimately concludes that "consideration of the danger he poses to the community . . . and analysis of the § 3553(a) factors do not support his request." *Gov't's Opp'n* at 1.

The Government first discusses the COVID-19 pandemic and the safety precautions that the BOP has imposed in response. *Id.* at 2-3. At the time of briefing, the BOP was in phase nine of its COVID action plan. *Id.* at 3. Under phase nine, certain inmate treatment, educational, and recreational programming had resumed with social distancing modifications. *Id.* at 3-4. Phase nine also includes protocols for isolating and quarantining inmates who test positive, restricting non-essential contractor access to BOP facilities, suspending volunteer visits, and stopping social and legal visits. *Id.* at 4. "Taken together" the Government argues that "all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution." *Id.* at 5.

Next, the Government addresses the merits of Mr. Doe's motion. *Id.* at 8. First, the Government concedes that Mr. Doe's motion is timely because he "has exhausted his administrative remed[ies] by submitting a request for reduction in sentence to the warden and receiving a denial." *Id.* at 8 n.6. Second, "the Government agrees that, during the COVID-19 pandemic, the defendant's chronic medical conditions, specifically obesity . . . sets forth an 'extraordinary and compelling' reason for

5

purposes of 18 U.S.C. § 3582(c)." *Id.* at 9. However, the Government states that "the CDC guidance regarding asthma and primary hypertension reflects the ambiguity of the current medical understanding" and therefore "respectfully submits that while the Court may consider this potential additional risk in conjunction with [Mr. Doe's] obesity, the record . . . is insufficient to draw and conclusions from the larger constellation of medical ailments identified in the . . . motion." *Id.* at 10. Even though the Government acknowledges that Mr. Doe's medical conditions put him at increased risk of complications from COVID-19, the Government does not concede that Mr. Doe's obesity increases his risk of contracting COVID-19 at FCI Danbury. *Id.*

Despite Mr. Doe's health conditions, the Government contends that he "poses a serious danger to the community if released." *Id.* More specifically, the Government observes that this is Mr. Doe's second child pornography conviction, "[d]espite his prior conviction and incarceration, the defendant committed the same crime against children," and therefore Mr. Doe "appears unwilling to attempt to control" his "sexual interest in children." *Id.* at 11. Noting the need for deterrence, the Government avers that "[r]eleasing [Mr. Doe] now would not sufficiently deter him, just as his initial three-year federal sentence . . . failed to deter the current crime of conviction." *Id.* Finally, the Government addresses the need for Mr. Doe's punishment to "reflect[] the seriousness of the offense, promot[e] respect for the law, and provid[e] just punishment. *Id.* It further states that "Congress has enacted a mandatory minimum sentence of 10 years for recidivists of [Mr. Doe's] ilk" and "[t]he

early termination of Mr. Doe's sentence would not adequately reflect the seriousness of his conduct and the danger it poses . . .." *Id.* at 11-12.

### C.    Darin Doe's Reply

In his reply, Mr. Doe pushes back on the Government's dangerousness-based argument.  He notes that he has "an unblemished disciplinary record since being sentenced," has received a positive evaluation from FCI Danbury's psychology department, completed educational programming, and will be on ten years of supervised release if the Court grants his motion. *Def.'s Reply* at 2.  Mr. Doe also argues that "just punishment does not require Mr. Doe's continued detention in deadly conditions." *Id.* at 3.  In support, he cites a number of cases for the proposition that COVID-19 and its incumbent risks present an added punishment for an inmate. *Id.*  Mr. Doe also notes that his offense was nonviolent, but that even "violent felons," "serious drug traffickers," and "fraudsters" have been granted compassionate release. *Id.* at 4.  Mr. Doe ends by discussing the relative risks of COVID-19 exposure between FCI Danbury and release to Winslow, Maine.  *Id.* at 4-5.  He argues that FCI Danbury is relatively high-risk compared to Kennebec County and that therefore "Mr. Doe's risk would be drastically minimized upon release." *Id.* at 4-5.

### D.    Darin Doe's Supplemental Memorandum

Mr. Doe's supplemental memorandum notes that "the situation at FCI Danbury where Mr. Doe is confined has worsened considerably" since he filed his reply memorandum on November 12, 2020. *Def.'s Suppl. Reply* at 1.  He notes that "nearly 100 inmates (out of approximately 600) at Danbury are now confirmed cases."

7

*Id.*  He states "that 4 of the 10 units at Danbury are currently 'locked down' due to the rapid spread of the virus."  *Id.*

## III.   LEGAL STANDARD

Over the course of the COVID-19 pandemic, the Court has addressed the legal standard for deciding a motion for compassionate release on several occasions.  *See, e.g., United States v. Crosby*, 1:17-cr-00123-JAW-01, 2020 U.S. Dist. LEXIS 199085, at *16-23 (D. Me. Oct. 27, 2020).  Put succinctly, 18 U.S.C. § 3582(c)(1)(A)(i) permits a court to modify a term of imprisonment when (1) "extraordinary and compelling reasons warrant" the movant's release, (2) release is consistent with "the factors set forth in [18 U.S.C. §] 3553(a)", and (3) release comports with "applicable policy statements issued by the Sentencing Commission . . .."  18 U.S.C. § 3582(c)(1)(A).[1]

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A).[2]  This policy statement requires that the movant must

---

[1]      Section 1B1.13 of the United States Sentencing Commission Guidelines addresses reductions in the terms of imprisonment under 18 U.S.C. § 3582(c)(1)(A).  But the Commission promulgated these provisions before Congress enacted the First Step Act.  *See United States v. Brooker*, 976 F.3d 228, 230-34 (2d Cir. 2020) (discussing the history of § 1B1.13 and the First Step Act).  As Judge Hornby of this District noted, the "Second, Fourth, Sixth and Seventh Circuits have . . . ruled that the Guideline policy statement applies only to motions brought by the Director of the Bureau of Prisons, not to motions for relief brought by defendants, and nothing limits judges' discretion in considering 'the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release."  *United States v. Almeida*, 2021 U.S. Dist. LEXIS 364, at *4 (D. Me. Jan. 4, 2021) (quoting *Brooker*, 976 F.3d at 235-37 and citing *United States v. McCoy*, 981 F.3d 271, 281-83 (4th Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-11 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)); *see United States v. Gowdy*, No. 20-60800 Summary Calendar, 2020 U.S. App. LEXIS 40409, at *3 (5th Cir. Dec. 28, 2020) (describing whether § 1B1.13 applies to motions for compassionate release as an "open question"); *United States v. Pelloquin*, No. 20-12818-DD, 2020 U.S. App. LEXIS 39966, at *4 (11th Cir. Dec. 21, 2020) ("not frivolous").

[2]      As the Court has previously discussed, "[t]he Sentencing Commission promulgated this policy statement before the emergence of the COVID-19 pandemic and before the changes to § 3582 put in place by the FIRST STEP Act; its provisions are therefore not directly related to the unique

meet the "requirements of subdivision (2)," which provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018) (U.S.S.G.).   Section 3142(g) sets forth four factors that a court must consider before releasing a person pending trial.   They include: (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

The policy statement also provides criteria for determining whether "extraordinary and compelling reasons" exist to release the defendant.   U.S.S.G. § 1B1.13 cmt. n.1.  These reasons include certain enumerated terminal illnesses and similar conditions, physical, functional, mental, or cognitive impairments, age, family circumstances, and other unenumerated reasons.  *Id.* § 1B1.13 cmt. n.1 (A-D).  The policy statement further provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment."  *Id.* § 1B1.13 cmt. n.2.  Finally, it states that "[p]ursuant

---

circumstances presented by a global pandemic.  Nevertheless, the Court finds the policy provisions are a useful starting point for its analysis of the compassionate release motion."  *Crosby*, 2020 U.S. Dist. LEXIS 199085, at *20 n.1.  Similarly, Judge Hornby of this district has ruled that this policy statement "'provides helpful guidance' but is 'not ultimately conclusive given the statutory change.'"  *See United States v. Rembert*, No. 2:12-CR-66-DBH, 2020 U.S. Dist. LEXIS 210841, at *1 (D. Me. Nov. 11, 2020) (quoting *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 U.S. Dist. LEXIS 115388, at *4 (D. Me. July 11, 2019), *aff'd*, No. 19-1785 (1st Cir. July 23, 2020)).  The Court agrees.

to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* cmt. n.3.

The movant bears the burden of proving that he is entitled to a sentence reduction, and "the Court has broad discretion to grant or deny a motion for sentence reduction." *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-108-LM, 2020 U.S. Dist. LEXIS 83396, at *4 (D.N.H. May 12, 2020) (internal citations omitted)).

## IV.   FACTUAL BACKGROUND

### A.   The Presentence Investigation Report

The Court relied upon and adopted the facts in a revised presentence investigation report (PSR) prepared by U.S. Probation and Pretrial Services (PO) when it sentenced Mr. Doe.  *Restricted U.S. Probation Filing*, Attach. 3, *Revised Presentence Investigation Report* (ECF No. 33) (*PSR*); *see id.*, Attach. 2, *Statement of Reasons*.[3] The Court relies on the facts set forth in the PSR here as well.

#### 1.   Darin Doe's History and Characteristics

Darin Doe was born in May of 1976 in Waterville, Maine.  *PSR* ¶ 33.  At the time of his sentencing, he had a good relationship with his mother, father, and brother.  *Id.*  Mr. Doe is a lifelong Maine resident, apart from a prior term of

---

[3]      As explained later, at the sentencing hearing, the Court accepted the guideline calculations with one exception.  By agreement of the parties, the Court altered the Criminal History calculation by counting 2003 convictions for violations of privacy, thereby increasing his Criminal History score to 5 and his Criminal History category from II to III.  The result was a guideline sentence range of 121 to 151 months of incarceration.  The Court imposed the statutory minimum sentence of 120 months.

incarceration at FMC Devens in Massachusetts.  *Id.* ¶ 34.  He claims that he was not abused or neglected during his childhood but once stated that he was molested at the age of eight by someone close to his family and was given child pornography during that time.  *Id.*  Mr. Doe is a 1994 graduate of Winslow Senior High School in Winslow, Maine.  *Id.* ¶ 45.  He attended Kennebec Valley Technical College in Fairfield but withdrew after completing six credits.  *Id.*

In 1997, Mr. Doe married Jennifer Tash, but they divorced in approximately 2003 and Mr. Doe claims they have no contact.  *Id.* ¶ 34.  The pair had no children together.  *Id.*  Mr. Doe has one child from his six-year relationship with a woman named Megan Philbrick.  *Id.* ¶ 35.  That relationship ended in 2012 and Mr. Doe had sole custody of the child from 2012 until November 2015 when investigators confronted him about viewing child pornography.  *Id.*  According to Ms. Philbrick, Mr. Doe was "very very happy" to be a father and has always been an involved parent.  *Id.*  She further states that she has never had any concern about her child's well-being while he was in Mr. Doe's care.  *Id.*

During his first stint in federal prison, Mr. Doe briefly participated in the BOP's Sex Offender Management Program (SOMP).  *Id.* ¶ 41.  He did not complete it because he entered the program approximately six months before his release.  *Id.*  A SOMP discharge report revealed that Mr. Doe admitted that he has a long history of possessing child pornography, voyeurism, and soliciting prostitution.  *Id.*  He was found to be a moderate risk of sexual recidivism and had reportedly disclaimed and minimized the pervasiveness of his sexual impulses.  *Id.*  Mr. Doe received continued

11

sex offender treatment after his release from prison.  *Id.* ¶ 42.  Mr. Doe's therapist conducted a Static-99 and RRASOR assessment, which indicated that Mr. Doe was medium high risk, noted that he failed mentioned his voyeuristic behavior or any other perversions listed in the SOMP discharge report, and indicated Mr. Doe was generally not forthcoming with information.  *Id.*  Mr. Doe's therapist concluded that it was "imperative" that Mr. Doe receive sex offender treatment so that he would stop minimizing the harm caused by his consumption of child pornography.  *Id.*

Mr. Doe's substance abuse history consists of alcohol and marijuana use. *Id.* ¶ 44.  He first consumed alcohol in 1997 and reports that he most frequently used it in 1998 while "hanging out with friends."  *Id.*  More recently, Mr. Doe's consumption of alcohol has been sporadic and not problematic.  *Id.*  According to the PSR, Mr. Doe first used marijuana in 1999 and last used in in November 2015.  *Id.*  In 2001 he was using marijuana between one and three times per day.  *Id.*  The PSR for his first offense indicated that Mr. Doe did not believe he had an alcohol or marijuana problem but that substance abuse counseling might be beneficial.  *Id.*  He completed the BOP's Residential Drug Abuse Program (RDAP) while in BOP custody for his first offense. *Id.*  He was found to meet the criteria for alcohol dependence and cannabis abuse.  *Id.* He submitted twenty-one urine samples during his term of supervised release, and all were negative for illicit substances.  *Id.*

### 2.   Darin Doe's Criminal History

Mr. Doe has a history of pornography-related offenses.  On January 16, 2002 he was arrested and federally prosecuted in the District of Maine for receiving child

pornography. *Id.* ¶ 27. On November 20, 2001, a computer technician employed by Virtual Dimensions in Waterville, Maine located child pornography on Mr. Doe's computer while performing routine service procedures. *Id.* The technician contacted the Waterville Police Department, which obtained a search warrant for the computer and interviewed Mr. Doe. *Id.* During the interview, Mr. Doe stated that he may be, unintentionally, in possession of more than one hundred images of child pornography. *Id.* He also stated that the pornography may have resulted from a computer hack and he may have received it through a file transfer protocol he used to trade music and adult pornography. *Id.*

A forensic examination of this computer revealed at least 1,192 images of child pornography on Mr. Doe's hard drive. *Id.* This included images of children under the age of seven, including some younger than three, engaged in a variety of sexual acts. *Id.* Mr. Doe's collection was alphabetized and also subdivided by age, race, type of sex act, and series name. *Id.* Some of the files were inaccessible due to military-grade encrypted passwords, which investigators determined could take as many as ten years to decipher. *Id.*

Mr. Doe pleaded guilty to receipt of child pornography. *Id.* On July 1, 2002, he received a sentence of thirty-three months of incarceration, three years of supervised release, a $100.00 special assessment, and a $3,600.00 fine. *Id.* The BOP sanctioned him while in prison because, while participating in the Sex Offender Management Program, Mr. Doe was found to be collecting contraband pornography. *Id.* To avoid detection, he concealed the contraband inside magazine covers. *Id.*

On December 16, 2004, Mr. Doe was released from prison and began a term of supervised release. *Id.* It did not last long. In October 2003, while he was still incarcerated, authorities had charged Mr. Doe with two counts of violation of privacy in Cumberland County Superior Court in Portland. *Id.* ¶ 28. These charges arose from an investigation that the Cumberland County Sheriff's Department began in July 2003. *Id.*

During Mr. Doe's incarceration for his federal sentence, his then-wife began the process of divorcing him and moving out of their shared residence. *Id.* While moving, she found a wooden lockbox in their attic. *Id.* She opened the mysterious box after locating its key in her husband's belongings. *Id.* Inside, she found several video tapes, nude photographs, a wireless pinhole camera, a collection of women's underwear, a photo album, and a zip drive. *Id.* Several of the videos showed Mr. Doe having sexual intercourse with different prostitutes. *Id.* Other videos were from a camera that Mr. Doe had hidden in the bathroom and guest bedroom of his residence. *Id.* Those videos depicted Mr. Doe's wife and two of her friends using the bathroom, showering, and getting ready in the guest bedroom. *Id.* The women did not know they were being recorded. *Id.* The box contained nude photographs as well. *Id.* The photographs showed nude women in tanning beds and investigators later determined Mr. Doe had previously worked at his father's tanning salon. *Id.* Finally, there were videos of Mr. Doe and other men smoking marijuana and watching the videotapes together. *Id.*

On October 21, 2003, officers interviewed Mr. Doe about the box's contents. *Id.* During that interview, Mr. Doe admitted to soliciting prostitutes on at least ten occasions between 1999 and 2002 to have sex with him in exchange for marijuana or cash. *Id.* He also admitted to installing a hidden camera in his house and videotaping "a couple dozen" people without their knowledge. *Id.* In addition, he acknowledged that he had taken photos of a woman sunbathing. *Id.* He stated that he had not uploaded these photos and videos to the internet. *Id.* Mr. Doe further stated that he had collected panties from the various strip clubs and prostitutes that he had patronized over the years. *Id.* He was summonsed for twenty-four counts of violation of privacy and ten counts of engaging in prostitution; however, he was only charged with two counts of violation of privacy. *Id.* On July 14, 2005, he was sentenced to three-hundred sixty-four days of incarceration, all but nine months suspended, and one year of probation on count one, and three-hundred sixty-four days, all suspended, concurrent with one-year of probation on count two. *Id.*

As a result of his state custodial sentence, Mr. Doe's term of federal supervised release was tolled from July 14, 2005 to January 16, 2006. *Id.* ¶ 27. His term of supervised release terminated on June 14, 2008. *Id.*

### 3.    Nature and Circumstances of the Offense

In September 2011, investigators from the United States Department of Homeland Security, Homeland Security Investigations unit (HSI), and the Maine State Police Computer Crimes Unit (MSPCCU) began investigating a peer-to-peer file sharing network called Freenet. *Id.* ¶ 2. As part of this investigation, an

15

MSPCCU detective observed a device connected to a particular IP address requesting downloads of suspected child pornography on three separate occasions in October 2015. *Id.* ¶ 3. Using Freenet and a program named Emule, the detective connected directly to the computer at the suspect IP address and downloaded an unknown number of files of child pornography. *Id.* Further investigation revealed that the IP address belonged to Lois Doe of Winslow, Maine. *Id.* Next, law enforcement searched records from the Maine Department of Motor Vehicles and learned that a man named Darin Doe resided at the Winslow address. *Id.* Law enforcement confirmed that Mr. Doe had a prior federal conviction for receipt of child pornography. *Id.*

On October 27, 2015, law enforcement obtained a search warrant for the Winslow residence, which they executed on November 4, 2015. *Id.* ¶¶ 3-4. Mr. Doe was at work at the time of the search, so some agents went to interview him there. *Id.* ¶ 4. Mr. Doe agreed to a voluntary interview after the agents told him that he was not under arrest. *Id.* During the interview, Mr. Doe informed agents that he was familiar with the internet, peer-to-peer networks, and torrents. *Id.* He acknowledged using a program named CCleaner to clean his computer's hard drive and also told law enforcement he knew how Emule worked. *Id.* Mr. Doe disclosed that he had used his computer to search for modeling photos of a fifteen- or sixteen-year-old female rather than nude photos. *Id.* Mr. Doe claimed he sometimes received nude images of girls aged between twelve and fourteen during his search for the modeling photos, but he was not interested in them. *Id.*

16

The interview continued after Mr. Doe and the agents returned to his residence. *Id.* He explained to the agents that he used the Emule program to download files of teenage girls. *Id.* Sometimes though, he claimed, the files contained child pornography. *Id.* Mr. Doe stated that he deleted the files when they contained child pornography. *Id.* Agents challenged Mr. Doe on this. *Id.* They asked him why the majority of the files on his computer contained images under the age of ten, such as the so-called Tara and Vicky series. *Id.* Mr. Doe replied that he was familiar with the Tara and Vicky series and realized those victims were not teenagers. *Id.*

Mr. Doe admitted to masturbating to videos from both series. *Id.* He told investigators that he tried to convince himself he was not interested, but acknowledged that it had not worked, and that he had viewed images of females under age twelve in October and November 2015 for sexual purposes. *Id.* He stated that he had considered going to therapy but feared seeking help would require admitting to a crime. *Id.* Mr. Doe denied ever having sexual contact with a child. *Id.*

A forensic analysis of Mr. Doe's laptop revealed 7,947 images depicting child pornography. *Id.* ¶ 5. Most of the victims were prepubescent females appearing under the age of twelve. *Id.* The analysis also revealed that Mr. Doe frequently searched for terms related to child pornography, such as "cheese pizza," which investigators learned is code for child pornography. *Id.* The investigators consulted with the National Center for Missing and Exploited Children, which indicated 2,286 of the image files had been previously identified by law enforcement and that the images represented ninety separate series. *Id.*

### 4.   Sentencing Guideline Calculations

The Court determined that Mr. Doe had a total offense level of thirty and was a criminal history category III. *Statement of Reasons* at 1. The relevant range under the U.S. Sentencing Guidelines was one hundred twenty-one to one hundred fifty-one months imprisonment, five years to life on supervised release, and a fine between $30,000.00 and $250,000.00. *Id.* The Court sentenced Mr. Doe to the mandatory minimum one hundred twenty months imprisonment, ten years of supervised release, $5,000.00 in restitution, a $100.00 special assessment, and no fine. *Min. Entry* (ECF No. 22).

### B.   Darin Doe's Medical Records

The Court reviewed the medical records Mr. Doe submitted. Mr. Doe identified his obesity, asthma, hypertension, and sleep apnea as relevant to his motion. *Def.'s Mot.* at 5-8. His BOP medical records corroborate these diagnoses. *Def.'s Mot.*, Attach. 1, *Bureau of Prisons Health Servs. Clinical Encounter, June 18, 2020* at 1, 3 (*June 18 Record*); *id.*, Attach. 2, *Bureau of Prisons Health Servs. Health Problems* at 1 (*Sept. 24 Record*); *id.*, Attach. 6, *Clinical Encounter – Administrative Note* at 1.

## V.   DISCUSSION

### A.   Exhaustion

Section 3582(c)(1)(A)'s exhaustion requirement is a non-jurisdictional claim processing rule. *United States v. Whalen*, No. 1:11-cr-00033-JAW, 2020 U.S. Dist. LEXIS 118896, at *17-18 (D. Me. July 7, 2020). As such, the Government may waive

or concede exhaustion. *Id.* at *18. When the Government waives exhaustion, the Court may decide the merits of a motion for compassionate release. *Id.*

Here, the Government concedes that Mr. Doe's motion is timely. *Gov't's Opp'n* at 8 n.6. Moreover, more than thirty days passed between Mr. Doe's request to the warden at FCI Danbury on May 22, 2020 and when he moved for compassionate release. *Def.'s Mot. for Appointment of Counsel*, Attach. 2, *Resp. to Inmate Req. to Staff Member* at 2-3. The Court concludes the motion is timely.

### B.    Extraordinary and Compelling Reasons

The Government concedes that in light of the COVID-19 pandemic, Mr. Doe's "obesity constitutes an extraordinary and compelling reason warranting his release." *Gov't's Opp'n* at 1. The Court agrees. Mr. Doe's health conditions including severe obesity, asthma, and hypertension, heighten his risk of severe complications from COVID-19 and therefore present an extraordinary and compelling reason to release him. Even so, this does not resolve Mr. Doe's motion. The Court analyzes the risk that COVID-19 presents to Mr. Doe by considering his health conditions alongside his risk of exposure both inside and outside of prison. This analysis favors granting the motion; however, Mr. Doe's dangerousness and the section 3553(a) factors ultimately persuade the Court that release is not appropriate.

### 1.    Darin Doe's Medical Conditions

According to the CDC, several factors increase a person's risk of severe illness from COVID-19. Arguably, the most decisive factor is a person's age. *Older Adults*, CDC,        https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-

adults.html (last visited Jan. 22, 2021).  Generally, the risk of COVID-19 increases as a person ages, with over eighty percent of deaths occurring in people who are sixty-five or older.  *Id.*  However, people younger than sixty-five may still face high risk of complications.  *Id.*  Fortunately, Mr. Doe is in his forties and does not fit within the age-related risk category.

Regardless of age, people with certain medical conditions are also at high risk.  *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html       (last    visited Jan. 22, 2021) (*CDC COVID Med. Conditions*).[4]  Mr. Doe is one such person.  His medical records indicate that he is severely obese, with a BMI of 43.6.  *Sept. 24 Record* at 1; *Def.'s Mot.* Attach. 3, *CDC: Healthy Weight, Nutrition and Phys. Activity*, *Adult BMI Calculator* at 1.  Moreover, he has hypertension and asthma, both of which the CDC says may increase his risk of severe complications.  *Id.*; *CDC COVID Med. Conditions*.  The effect of his sleep apnea on his risk is uncertain, but CDC guidance states that "the more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19."  *CDC COVID Med. Conditions*.  Thus, consistent with CDC guidance, the Court concludes that Mr. Doe has an increased risk of serious complications should he contract COVID-19.  This finding weighs in favor of release.

---

[4]       These conditions include: cancer, chronic kidney disease, COPD, heart conditions, weakened immune systems from organ transplants, obesity (BMI > 30), severe obesity (BMI > 40), pregnancy, sickle cell disease, smoking, and Type 2 diabetes.  *See CDC COVID Med. Conditions*.  Moreover, the CDC has indicated that individuals with asthma, cerebrovascular disease, cystic fibrosis, hypertension, non-organ transplant-related immunodeficiencies, neurologic conditions, liver disease, pulmonary fibrosis, Thalassemia, Type 1 diabetes, or who are overweight (BMI > 25), might be at increased risk.  *Id.*

### 2.  FCI Danbury and COVID-19

The relevant data for analyzing Mr. Doe's risk of COVID-19 exposure are the data from FCI Danbury, where he is incarcerated.  Located in Danbury, Connecticut, FCI Danbury houses 640 inmates.  *FCI Danbury*, BOP, https://www.bop.gov/locations/institutions/dan/ (last visited Jan. 22, 2021). According to the BOP, there is one active case of COVID-19 among inmates at FCI Danbury and one among staff.  *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Jan. 22, 2021).  However, FCI Danbury has experienced one inmate death from COVID-19.  *Id.*  One hundred eighty-six inmates and seventy-nine staff have caught the virus and recovered.  *Id.*

The Court concludes that, in tandem, the difficulty of maintaining effective social distancing in the prison setting combined with the presence of COVID-19 in FCI Danbury favors releasing Mr. Doe.

### 3.  Maine versus FCI Danbury

If the Court released Mr. Doe, he would not enter a world free from COVID-19. Therefore, the Court considers what the record reveals about the relative risks of contracting the virus in FCI Danbury against his preferred residence—his parents' home in Winslow, Maine.  Previously, the Court reasoned:

> The focus of the petition for compassionate release is on whether an inmate should be released from incarceration based on the risks in federal prison, not whether there are risks outside prison over which the Court has limited authority.  However, at the extremes, the Court could consider the effect of an obviously risky release plan on the merits of a motion for compassionate release.

*United States v. Truman*, No. 1:17-cr-00073-JAW-4, 2020 U.S. Dist. LEXIS 216934, at *42 (D. Me. Nov. 19, 2020).

Here, Mr. Doe provided limited information with which the Court may assess the relative risks. However, it appears that his parents have been a source of support for him throughout his life, especially after his first federal conviction. On balance, the Court concludes that the prevalence of COVID-19 at FCI Danbury and the difficulty of maintaining social distancing in the prison environment favor compassionate release.

###   C.   Danger to the Community

18 U.S.C. § 3142(g) requires the Court to consider whether the defendant has a history of controlled substance offenses or crimes of violence. *Id.* § 3142(g)(1). In addition, the Court must consider "whether, at the time of the current offense or arrest, [Mr. Doe] was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . .." *Id.* § 3142(g)(3)(B). The Court must also consider the nature and seriousness of the danger releasing a defendant poses to the community. *Id.* § 3142(g)(4).

Here, the Court concludes that Mr. Doe has not met his burden to show that he is no longer a danger to the community. During his most recent offense, he possessed nearly 8,000 images of child pornography; most depicted girls younger than twelve. When law enforcement caught him, he first attempted to cover his tracks by telling officers that he had accidentally received the illicit images while searching for

scantily clad images of a teenaged model.  Mr. Doe eventually admitted that he knew his actions and impulses were criminal because he knew some of his victims' ages. He further admitted that he did not seek help or counseling because he did not want to incriminate himself.  This admission is troubling because much of Mr. Doe's past crimes occurred in secret.  Indeed, although written more than a decade ago, his prior therapist's Static-99 and RRASOR assessment that he is secretive about his wrongdoing and sexual urges appears still to ring true.  As Mr. Doe has been reluctant to seek help controlling his criminal urges in the past, it seems that continued incarceration may be the only viable means to protect the public from future crimes.

In addition to the offense-of-conviction in this case, the record indicates Mr. Doe has a history of pornography-related offenses.  This history includes a prior conviction for receipt of child pornography, for which Mr. Doe served nearly three years in federal prison.  He was sanctioned during that prison term for possession of pornography while participating in SOMP.  That earlier federal sentence, however, did not deter him.  His criminality continued, and he is now a recidivist serving a mandatory ten-year prison sentence.  The danger Mr. Doe poses to children is self-evident.  His criminal history shows that he harbors a long-standing and often uncontrolled prurient interest in children as sexual objects.  What's more, his most frequent victims—children, some toddlers—are among the most vulnerable members of our society.

Mr. Doe's prior convictions for invasion of privacy are also a source of concern. He used hidden cameras in both public and private places to photograph women while

they tanned, changed clothes, showered, and used the toilet.  Apparently, even the intimacy of Mr. Doe's marriage could not stave off his obsession with sex and voyeurism, as one of his victims was his then-wife.  It is difficult to precisely quantify the risk Mr. Doe poses to adult women because this offense occurred nearly twenty years ago.  Even so, the Court concludes that this offense was abnormal and highly intrusive and therefore persuades the Court that a cognizable risk lingers.  This weighs against release.

Mr. Doe correctly observes that there is no evidence that he is violent; however, that does not mean he is not dangerous.  Child pornography depicts child abuse, which is by its very nature the perpetration of sexual violence upon children.  By seeking it, Mr. Doe encouraged a market which produces and disseminates abuse.  Due to Mr. Doe's history of recidivism, the Court remains concerned that, if released, there remains a risk that over time he could commit another child pornography offense, or worse.  For this reason, the Court concludes that Mr. Doe is a danger to the community.  Therefore, his release is not warranted despite the dangers posed by the COVID-19 pandemic.

Briefly, the Court recognizes that while incarcerated Mr. Doe has sought rehabilitation and it commends him for doing so.  Mr. Doe submitted a progress report from the BOP, which shows that he is progressing toward his eventual rehabilitation. *Def.'s Reply*, Attach. 1, *Summary Reentry Plan – Progress Report* at 1-2 (*Progress Report*).  But he is not there yet.  According to the report, Mr. Doe has obtained work assignments as a dorm orderly and an inmate suicide companion, participated in a

24

number of educational courses, has had positive interactions with staff and inmates, and committed no disciplinary violations during this sentence. *Id.* at 1-2. The Court urges Mr. Doe to continue his efforts to better himself, they will aid him greatly once he completes his term of incarceration.

### D.   Section 3553(a) Factors

The Court must also weigh factors such as whether Mr. Doe's sentence "reflect[s] the seriousness of the offense, [promotes] resect for the law, and [provides] just punishment . . .." 18 U.S.C. § 3553(a)(2)(A). In addition, the Court must consider deterrence and the need to protect the public. *Id.* § 3553(a)(2)(B)-(C).

The Court previously considered these factors at sentencing and again concludes that Mr. Doe's one-hundred-twenty-month sentence is "sufficient but not greater than necessary" to achieve the purposes of the law. 18 U.S.C. § 3553(a). The Court discussed the nature and seriousness of this offense and the need to protect the public. Here, the Court focuses briefly on the need for deterrence, just punishment, and promoting respect for the law.

The Court sentenced Mr. Doe to the ten-year mandatory minimum, which Congress established for recidivist child pornography offenders under 18 U.S.C. 2252A(b)(2). The Court's decision to apply the mandatory minimum resulted in a one-month downward variance from his one-hundred-twenty-one-month to one-hundred-fifty-month guideline range. To date, Mr. Doe has served less than four years of that sentence. *Progress Report* at 2.

Reducing Mr. Doe's sentence would undermine the mandatory minimum's deterrent effect. His current time-served is only slightly more than his prior child pornography sentence, which did not adequately deter him. The Court is of the view that continued incarceration will more effectively deter Mr. Doe from future criminal behavior after his eventual release.

The Court is also concerned about the effect of an early release on general deterrence. To be sure, this factor is difficult to measure with precision and there is nothing in the record suggesting that Mr. Doe was well-known among child pornographers. However, as the investigation of this case demonstrates, those interested in child pornography rely on file-sharing communities to gain access to illicit material. Accordingly, the Court concludes that it is possible that similar offenders may learn of his crime and punishment. In addition, in the Court's experience, the public pays particular attention to sexual offenses against children. Few crimes cry out for justice as loudly. In light of these considerations, it is the Court's conclusion that the amount of time Mr. Doe has served is too short a period of incarceration to effect specific and general deterrence or sufficiently punish him for a serious offense. The § 3553(a) factors weigh against his release.

### E.   The Balance Weighs Against Granting Darin Doe's Motion

The Court recognizes that Mr. Doe's medical history, the risk of serious COVID-19 complications, and the risk of contracting COVID-19 within FCI Danbury presents a compelling case for release. But, just as Mr. Doe seeks protection from COVID-19, federal law aims to protect children from people like Mr. Doe. Here, the

need to protect the public must prevail. Twice now, Mr. Doe's pursuit of child pornography has landed him in federal prison. He is a known recidivist and reducing his current prison term would fail to adequately punish his conduct and to protect children who are unable to protect themselves. A sentence modification would also undermine the need to deter Mr. Doe and others who might be tempted to view child pornography. Thus, although the Court recognizes Mr. Doe's concerns about COVID-19 are justified and hopes that he does not experience any harm from the pandemic, the Court concludes compassionate release is not warranted at this time.

## VI.    CONCLUSION

The Court DISMISSES without prejudice Darin Doe's Petition for Compassionate Release (ECF No. 39).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 22nd day of January, 2021